UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY SMITH,<br><br>        Petitioner,<br><br>    v.<br><br>W. MUNIZ, Warden,<br><br>        Respondent. | No. 1:18-cv-00709-DAD-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently serving a sentence of 25-years-to-life in state prison for his 2015 conviction for possession of drugs in prison. His habeas action challenges the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.    PROCEDURAL HISTORY**

On April 22, 2015, a jury in the Kern County Superior Court found Petitioner guilty of possession of drugs in prison (Cal. Penal Code § 4573.8). (Doc. 1 at 1.) In a bifurcated proceeding, he was found to have ten prior convictions. People v. Smith, No. F071775, 2016 WL 4131816, at *2 (Cal. Ct. App. 2016). The trial court sentenced him to a prison term of 25-years-to-life. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On August 3, 2016, the judgment was affirmed. Id. Petitioner filed a petition for review

1

in the California Supreme Court, and the petition was denied on October 26, 2016. Id.

On May 24, 2018, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on October 1, 2018. (Doc. 14.) Petitioner filed a traverse on November 26, 2018. (Doc. 19.)

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

On June 9, 2013, appellant was confined as an inmate at Wasco State Prison. That day he received a visitor, whom he met in visiting room A. The visitation was monitored in a separate room through video surveillance by California Department of Corrections and Rehabilitation (CDCR) Correctional Officers Margarita Pedraza and Tobias Towle.

Via the video feed, Officers Pedraza and Towle observed the visitor remove a small, black, cylindrical object from her waist band and place it in appellant's rear pocket. Appellant and the visitor then moved to seats near a table. Appellant withdrew the object from his pocket, placed it inside of his pants, and appeared to be moving in a manner consistent with an attempt to hide the object in his anus.

Officers Pedraza and Towle then intervened. They took appellant and his visitor to separate locations and conducted an over-the-clothing search of each. Nothing was found. Appellant was then passed to Correctional Officer Antonio Medina for visual supervision. Officer Medina inspected a noncontact visiting booth, which is a single person room, accessed by a door, that contains a metal stool and is used by inmates to communicate with visitors through a glass partition. Finding nothing in the booth, Officer Medina placed appellant inside and monitored him through a window. Officer Medina could not see appellant's hands during this time, but did see appellant leaning back while sitting on the stool.

When it came time to remove appellant from the noncontact visiting booth, Officer Medina opened the door and instructed appellant to exit. As appellant exited the booth, Officer Medina saw him drop a black package onto the floor, near the metal stool. A subsequent unclothed body search conducted by Officer Towle again found no contraband on appellant. The dropped package was recovered, inspected, and tested. It was found to contain 27.56 grams of marijuana.

Prior to trial, appellant moved in limine to exclude any evidence describing what Officers Pedraza and Towle saw on the video surveillance system. Appellant argued the CDCR had an obligation to preserve any recordings made and noted that a July 2013 note indicated appellant had requested any existing video but was not provided it at his administrative hearing. [Fn.1.] The People responded that their investigation showed no signs an actual recording had been made at any point. The trial court, accepting this representation, denied appellant's motion. At trial, testimony showed that the video surveillance system is connected to a digital video recorder (DVR) that stores video in a 12-day loop, with new video overwriting what was recorded

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

12 days ago. However, due to the age of the system, there is no way to extract video. Rather, to obtain a recording one would have to place a camera in front of the display screen and separately record what is being shown. [Fn.2.]

[Fn.1.] There is no indication in the record when this request was first made.

[Fn.2.] Although a DVR system was mentioned, there was no testimony on whether playback of recorded material was possible. The only testimony on what could be recorded came from Officer Pedraza, who testified you would have to record the live feed directly.

Smith, 2016 WL 4131816, at *1–2.

### III. DISCUSSION

#### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

#### B. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

3

Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's

4

ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

    C.    Review of Petition

        1.    Actual Innocence

Petitioner first claims that he is innocent of the offense. In support of this claim, he alleges that there was video footage of the visiting room that was exculpatory. He also claims that the correctional officers made inconsistent statements as to whether Officer Medina saw Petitioner physically drop the contraband. Respondent contends that the allegation concerning the inconsistent statements made by the reporting officers is unexhausted. Respondent further argues that both allegations in the claim are meritless.

*a. Exhaustion*

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. Duncan v. Henry, 513 U.S. 364, 365 (1995). A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis. Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1, 9 (1992) (factual basis).

Respondent is correct that Petitioner failed to raise in the California Supreme Court the allegation that he was actually innocent in light of the inconsistent statements of the reporting officers. Petitioner only claimed he was actually innocent given the exculpatory material contained on the videotapes. In his traverse, Petitioner argues that he exhausted his claim because the "petition as submitted to the California Supreme Court sets forth (However general) a solid

federal basis for relief." (Doc. 19 at 2.) This is insufficient for exhaustion. As stated by the Supreme Court, "[c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." Keeney, 504 U.S. at 10. A petitioner must plead all material facts to "afford the State a full and fair opportunity to address and resolve the claim on the merits." Id.

Petitioner also contends that he presented the facts underlying his actual innocence claim in the context of his ineffective assistance of counsel claim and therefore exhausted the claim. This too is insufficient. Petitioner must specify the factual and legal basis for each claim. Duncan, 513 U.S. at 365; Kenney, 504 U.S. at 9. A claim is not fully presented where material facts are not pled in the claim. Thus, the claim is unexhausted. Nevertheless, the Court may deny the claim on the merits even if unexhausted. 28 U.S.C. § 2254(b)(2).

*b. Analysis of Claim*

Neither the Supreme Court nor the Ninth Circuit has "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins, 569 U.S. 383, 392 (2013); Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014). Even assuming such a claim exists, "the standard for establishing a freestanding claim of actual innocence is "'extraordinarily high' and . . . the showing [for a successful claim] would have to be 'truly persuasive.'" Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir.1997) (quoting Herrera v. Collins, 506 U.S. 390, 417 (1993). The Supreme Court has held that, at a minimum, the petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." Id. (citing Herrera, 506 U.S. at 442-44 (Blackmun, J., dissenting)). In determining whether a petitioner can make such a showing, the Supreme Court has referenced the Schlup "gateway" showing, which permits a petitioner to proceed on a procedurally barred claim by showing actual innocence. See, e.g., Carriger, 132 F.3d at 477. In order to pass through the Schlup actual innocence gateway, a petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" House v Bell, 547 U.S. 518, 537 (2006) (quoting Schlup, 513 U.S. at 327).

Petitioner fails to make such a high showing of actual innocence. First, there is no new

evidence. The inconsistencies of the reporting officers' statements were before the jury. His claim that the videotape contained exculpatory evidence and was destroyed is complete speculation. Moreover, as more fully discussed below, the subject of video evidence from the visitation room was fully litigated at trial, and there was nothing to indicate that such video evidence existed. Thus, he fails to make a showing that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" House, 547 U.S. at 537 (quoting Schlup, 513 U.S. at 327). The claim is meritless.

2. Alleged Destruction of Evidence

Petitioner next claims he was denied his Fourteenth Amendment right to due process when the state failed to preserve video evidence. Petitioner raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Appellant also argues that the CDCR's failure to preserve videotape evidence of the visiting room interactions between appellant and his visitor violated appellant's right to due process of law.
>
> *Standard of Review and Applicable Law*
>
> As a general rule, the duty of law enforcement agencies to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488 (*Trombetta*).) To protect against the real burden that would arise from an "absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance," courts use a sliding scale when analyzing a failure to maintain evidence. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 (*Youngblood*).) Where the lost evidence possesses "an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," there is a due process violation regardless of the reasons why the evidence was destroyed. (*Trombetta, supra*, 467 U.S. at p. 489.) However, when the evidence is merely "potentially useful," for example where "no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant," a defendant must also show "bad faith" on the part of law enforcement to demonstrate a due process violation. (*Youngblood, supra*, 488 U.S. at p. 57-58; *People v. DePriest* (2007) 42 Cal.4th 1, 41-42.)
>
> "On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling" regarding whether a due process violation occurred. (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)

///

7

*Substantial Evidence Supports the Trial Court's Decision*

On appeal, appellant makes no argument that the video footage from the visiting room possessed an exculpatory value that was apparent before any alleged destruction. In our own review, we found no such evidence either. Video evidence is not, in all instances, readily apparent as exculpatory evidence. In *People v. Alvarez*, for example, the court was unable to find that lost video evidence possessed apparent exculpatory value even when the defendant immediately insisted upon capture that the video would prove he committed no wrong. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 776.) Given that appellant does not argue on appeal that the exculpatory value of the video was apparent, and because there is no presumption of such a fact, we consider appellant's contentions under the *Youngblood* standard for "potentially useful" evidence.

Appellant contends the visiting room video was both potentially useful to the defense and destroyed in bad faith. As the video could have been analyzed and compared to the officers' stated reasons for detaining and searching appellant, we have no difficulty agreeing with appellant that a recorded video of the encounter would have been potentially useful evidence for the defense. We find, however, that substantial evidence supports the conclusion that there was no bad faith destruction of evidence.

The evidence presented prior to trial suggested a scenario where video surveillance was known to occur, but no recordings were present. The prosecutor confirmed he had no information that any type of videotape was ever in the CDCR's possession, that he had requested any videotapes, and that there was nothing to provide. At trial, more details were revealed. It was confirmed that no videotape existed because video could not be downloaded from the DVR attached to the surveillance system. In addition, while evidence showed the DVR held data for 12 days before it was recorded over, there was no evidence presented that this data could be reviewed or recorded. Rather, the only evidence suggesting video could have been collected showed the live feed could only be recorded if a separate stand-alone camera was pointed at the monitor.

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood, supra*, 488 U.S. at pp. 56-57, fn. *.) Viewing the evidence in the light most favorable to the trial court's ruling, the relevant time frame for determining whether a bad faith destruction of evidence occurred was the moment the surveillance took place. This is so because there is no record evidence showing that the video surveillance could have been preserved by later techniques had a camera not been pointed at the live monitor at all times. Under this timeframe, there is no evidence of bad faith destruction. With no camera recording at the time, there was no evidence to preserve. We see no reason why unrecorded surveillance should be treated any different than direct observation in this specific context—it is not evidence in need of preservation as it is flowing through to the monitor. [Fn.3.] As no evidence existed that must be preserved, the evidence supports the trial court's conclusion that no bad faith destruction occurred.

> [Fn.3.] We do not intend to suggest that once video is actually recorded in a manner subject to preservation there is no duty to preserve the video. We merely conclude that, on a record such as this, where the evidence does not support the conclusion that anything other than a live feed was recoverable, the evidence generated is equivalent to live observations and not to a recording.

8

> We note that, under the facts before us, our opinion would not change should the video be deemed capable of preservation and immediately destroyed or deemed destroyed at the point it was taped over, 12 days later. If the video is viewed as capable of preservation, but destroyed when not immediately recorded, there is no evidence demonstrating the CDCR allowed the video to be destroyed due to bad faith, as opposed to mere negligence in not always having a recording system available. (*Youngblood, supra*, 488 U.S. at p. 58 [finding failure to refrigerate clothing and perform tests negligent at worst, thus confirming no due process violation].) Officers have no way to know whether each unfolding moment of a general surveillance shift might be expected to play a significant role in an unknown suspect's defense to any later charges, and cannot be expected to anticipate whether each moment following the identification of a potential violation should be recorded. Thus, substantial evidence supports a finding of no bad faith.
>
> Even if we were to consider the video to have been preserved on the DVR but destroyed when recorded over 12 days later, the record still lacks evidence of bad faith. Although appellant argues the video was destroyed despite a request for use at his initial administrative hearing, the record does not reflect when that request was made. The only evidence in the record is a representation from the prosecutor that shows the request was rejected sometime in July 2013. As the incident occurred on June 9, 2013, the video would have been taped over by June 21, 2013. With no evidence to show the correctional officers were aware of any potentially exculpatory value to the video as of June 21, 2013, the available evidence supports the conclusion they did not act in bad faith.
>
> Substantial evidence thus supports the trial court's conclusion that no due process violation occurred. Having considered the full scope of appellant's argument on appeal and finding no error, we need not reach his ineffective assistance of counsel argument. (*People v. O'Malley* (2016) 62 Cal.4th 944, 1010 fn. 12.)

Smith, 2016 WL 4131816, at *2–4.

   *a. Legal Standard*

Due process requires that the prosecution disclose exculpatory evidence within its possession. Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007). There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005). A failure to preserve evidence violates a defendant's right to due process if the unavailable evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 489 (1984). A defendant

9

must also demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence. Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Phillips v. Woodford, 267 F.3d 966, 986-87 (9th Cir. 2001). The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed. Youngblood, 488 U.S. at 56-57; see also Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997); United States v. Barton, 995 F.2d 931, 934 (9th Cir. 1993); United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993). "The mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation." Phillips, 267 F.3d at 987 (quoting United States v. Hernandez, 109 F.3d 1450, 1455 (9th Cir. 1997)); see also Youngblood, 488 U.S. at 57.

*b. Analysis of Claim*

As determined by the appellate court, there was no evidence of any video recordings of the incident, nor was the CDCR aware of the exculpatory value of the video footage at the time it was destroyed. A video feed of the incident was transmitted to monitors; however, according to the record the only way to record the video was to position a camera aimed at the monitor. The appellate court reasonably determined that the exculpatory value of the video feed was not so apparent that CDCR should have recorded the visiting room at that time.

Further, the appellate court reasonably found that a video record of the encounter could have been potentially useful, but there was no indication of any bad faith destruction of evidence. No videotapes were created, because video could not be downloaded from the attached DVR. Therefore, there was nothing for the defense to provide.

Petitioner fails to show that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court authority. Therefore, the claim should be rejected.

3.  Ineffective Assistance of Counsel

Petitioner claims that counsel was ineffective in failing to seek exculpatory evidence in the form of a video surveillance tape. (LD 1 at 17-18.) He further complains that counsel failed to impeach witnesses with inconsistencies in the statements. These claims were presented to the California Supreme Court in a petition for writ of habeas corpus, and they were denied without

comment.

   *a. Legal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that

standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

  *b. Analysis of Claim*

Petitioner contends that defense counsel failed to seek the video surveillance tape of the visiting room. As pointed out by Respondent, no such video existed. As previously noted, video surveillance took place but the video feed was not recorded. The video feed was used simply as a tool for observation. At trial, Officer Towle explained that the DVR system retained footage on a loop for 12 days until it was recorded over and deleted; however, the DVR system was antiquated and was not equipped to download video. (RT 99-100.) Even if the footage could have been downloaded, the footage would have been deleted prior to any request by defense counsel to obtain it. The incident occurred on June 9, 2013, and would have been recorded over by June 21, 2013. As found by the appellate court, the earliest request for video surveillance evidence came from Petitioner on July 20, 2013. Thus, as no videotape or recorded video evidence existed at the time of defense counsel's representation, Petitioner cannot show that defense counsel erred in failing to investigate and obtain videotapes.

Petitioner also faults counsel for failing to impeach Correctional Officers Medina and Towle at trial on their inconsistent statements concerning the discovery of the contraband. The allegation is meritless. As stated by the superior court:

> Counsel did question Medina about making the statement to [Officer Evans] of not seeing Petitioner physically drop the object. The response by Medina was that he did not recall making the statement. Counsel could have impeached his testimony with the [Evan's report] or shown him the statement to see if a different answer could be obtained. Whatever the reason for not delving further into the issue, it cannot be said the omission didn't result from a tactical decision within the range of reasonable competence. *People v. Bunyard* (1988) 45 Cal.3rd 1189, 1215. Counsel may have been satisfied that he didn't deny making the statement.

(LD 12 at 4; RT 71-72.)

The superior court also determined that even if counsel had erred in failing to further question the officers, there was no prejudice. The court stated:

> Although he did not impeach Medina further, it cannot be said that his failure to do

so would have resulted in a different outcome. Two other officers saw Petitioner receive the object and place it in his pants. Before he could do anything further with the item, Petitioner was placed in a closed room that was free of contraband. He was watched by Medina and when he was removed, the item was located where Petitioner was seated. Nothing was found on Petitioner. The only reasonable conclusion from the circumstantial evidence is that petitioner was in possession of the object that turned out to contain marijuana. There is little, if any, probability the outcome would have been different had Medina been impeached. The evidence of Petitioner's guilt was overwhelming. [¶] [Further] . . . appellate counsel raised the video evidence issue on appeal. The fact that [the] appellate court rejected both trial and appellate counsels' arguments is through no fault of theirs. Petitioner can only expect adequate, not perfect counsel. *People v. Jackson* (2009) 45 Cal.4th 662, *People v. Smith* (1993) 6 Cal.4th 684, 696.

(LD 12 at 4.)

Petitioner fails to show that the state court decision was unreasonable. Defense counsel did question Medina concerning his statement of not seeing Petitioner physically drop the object, and he did explore the differences in each officer's recollections. (RT 69-72.) Counsel further argued that the differences reflected poorly on Medina's credibility. (RT 141-42.)

In sum, a fairminded jurist could conclude that Petitioner fails to show that counsel erred, or that he suffered any prejudice from counsel's alleged failure. The claim should be rejected.

## IV.     RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections

///

///

within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated: **December 5, 2018**              **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE